IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:20-CV-00330-GCM

| | |
|---|---|
| DEBORAH FRANKLIN,<br><br>Plaintiff,<br><br>v.<br><br>WENDE KERL,<br>CITY OF CHARLOTTE,<br><br>Defendants. | <u>ORDER</u> |

**THIS MATTER** comes before the Court on cross-motions for summary judgment by Plaintiff Deborah Franklin (ECF No. 21), Defendant City of Charlotte (ECF No. 18), and Defendant Wende Kerl (ECF No. 19). The Court has carefully considered the parties' briefs, responses, replies, and exhibits. The matter is now ripe for resolution.

For reasons that are explained below, the Court will deny Plaintiff's Motion for Partial Summary Judgment, grant Defendant City of Charlotte's Motion for Summary Judgment, and grant Defendant Wende Kerl's Motion for Summary Judgment.

I. BACKGROUND

This case resulted from a 2019 police shooting in Charlotte, North Carolina. Defendant Wende Kerl, a police officer employed by Defendant City of Charlotte, shot and killed Danquirs Franklin in a Burger King parking lot after responding to a 911 call. Franklin's mother Deborah, the representative of Franklin's estate, subsequently filed suit against Officer Kerl and the City of Charlotte, raising federal constitutional and state tort claims.

A. THE SHOOTING

At 9:01 AM on March 25, 2019, two people called 911 from the Burger King on Beatties Ford Road in Charlotte, North Carolina. ECF No. 20-6 at 1. They reported that a "customer had walked behind the counter to fight a staff person," and that the customer "ha[d] a gun." ECF No. 20-1 at 1. That customer—unbeknownst to the police—was Danquirs Franklin, the decedent.[1]

When the 911 calls came in, Officer Larry Deal and Officer Wende Kerl were talking in the parking lot of the Metro Division of the Charlotte-Mecklenburg Police Department (CMPD). ECF No. 25-5, 19:8–23. Deal and Kerl were experienced officers: Officer Deal joined CMPD in 2001, and Officer Kerl joined in 1995. *Id*. at 12:12–21; ECF No. 25-3, 8:18–21. The officers saw the call populate on Computer Aided Dispatch (CAD), a police computer program. ECF No. 25-5, 19:8–25, 20:1–19. It was classified as a Priority One call. *See* ECF No. 25-5, 65:17–21. The Burger King on Beatties Ford Road was just down the road from the Metro Division. *See* ECF No. 25-4 at 9. Both officers asked the dispatcher to assign them to respond, and then both officers started driving towards the Burger King in separate vehicles. ECF No. 25-5, 20:14–19.

As Officers Deal and Kerl were en route to the Burger King, another CMPD officer monitoring cameras in the Real-Time Crime Center (RTCC) radioed the responding officers that a suspect matching the description of the man given in the 911 calls had exited the Burger King. *Id*. at 21:20–25, 22:1–7; Video[2] at 00:30–00:57. The suspect was crouched near the passenger side

---

[1] Franklin had learned that his ex-partner, who worked at the Burger King, was romantically involved with a coworker. With his children in tow, Franklin assaulted his ex-partner and confronted the coworker, pointing a pistol at him before the coworker fled. Because these facts were not known to the police at the time of the 911 calls and the subsequent police response, they are solely included for context.

[2] The parties filed identical exhibits (Plaintiff's Exhibit 4 and Defense's Exhibit 9) of Officer Kerl's body-worn camera footage. The exhibits were submitted via electronic storage devices due to the inability to upload them through CM/ECF. All citations to "Video" refer to the body-worn camera footage.

2

of a maroon Honda parked in a handicapped spot in front of the restaurant. *Id.* Seconds later, both officers arrived at the Burger King parking lot. Video at 1:09.

The subsequent events are captured on Officer Kerl's body-worn camera.[3] Officer Deal pulled in first, parking his vehicle at an angle behind the Honda's left bumper. *Id.* at 1:08–13. Officer Kerl parked her car at an angle behind Officer Deal's patrol vehicle. *Id.* Both officers got out of their cars and drew their handguns. *Id.* at 1:09–15. Officer Deal stood behind his engine block, pointing his pistol at Franklin. *Id.* But from her vehicle, Officer Kerl could only see the driver side of the maroon Honda. *Id.* She could not see Franklin—only the passenger in the Honda.[4] ECF No. 25-2 at 2; ECF No. 20-4 at 14. Both officers shouted, "Let me see your hands," and "Let me see your hands, now!" Video at 1:10–18.

Officer Kerl moved to get a better view. ECF No. 25-2 at 2. Abandoning the cover of her own vehicle, Kerl ran in front of Officer Deal's drawn pistol, telling Deal: "I'm crossing, I'm crossing." Video at 1:17–21. She moved to the passenger side of the Honda, stopping in front of Franklin. *Id.* Franklin was perpendicular to her, facing the open passenger-side door of the Honda. *Id.* at 1:28. He was crouched on the balls of his feet, approximately one foot away from the Honda's male passenger. *Id.* Franklin's hands appeared to be clasped together between his legs. *Id.*; ECF No. 25-2 at 4. Officer Deal moved up to cover Officer Kerl, advancing from his car door until he was behind the trunk of the Honda. Video at 1:23–24; ECF No. 25-4 at 15.

---

[3] Officer Deal was not wearing a body-worn camera because he inadvertently left it on a traffic vest that he had been wearing the night before. ECF No. 25-5, 27:15–22.
[4] The passenger later turned out to be the manager of the Burger King. There was also a driver in the vehicle, who was the manager's wife. *See* ECF No. 25-6 at 12.

3

Both officers changed their commands. They had previously shouted, "Let me see your hands," but now they yelled, "Put the gun down now!" *See* Video at 1:10–24. Officer Kerl said to Officer Deal, "He's got a gun." *Id.* at 1:26–27. As the officers issued commands, two bystanders came out of the Burger King. ECF No. 20-4 at 15. One, a woman in a Burger King uniform, walked directly behind Franklin and the open Honda passenger-side door.[5] Video at 1:21–25. The officers yelled at her to get back: "Ma'am, get out of the way!" *Id.* at 1:31–34. She did so. *Id.* at 1:34–36. The officers continued shouting at Franklin: "Drop the gun!" "Drop it!" "Drop the weapon!" "I said drop it!" *Id.* at 1:28–43. Although neither officer remembers hearing it, Franklin responded: "I heard you the first time." *Id.* at 1:42–45; ECF No. 25-2 at 20; ECF No. 25-5, 51:11–14. The officers yelled: "Put it on the ground! Put the gun on the ground!" Video at 1:46–1:51.

Throughout the encounter, Franklin hardly made eye contact with the officers. *See id.* at 1:20–52. His gaze was mostly fixed on the ground. *See id.* At points, he appeared to be talking with the passenger in the Honda.[6] *See, e.g.*, *id.* at 1:25–26. At other points, he turned his head away from officers to look in the direction of the Burger King. *See, e.g.*, *id. at* 1:42. His expression was largely impassive. *See id.* at 1:20–52. As the Honda passenger later put it, Franklin seemed "just in a daze." ECF No. 25-1 at 24.

The officers continued to yell, "Put it on the ground!" Video at 1:46–51. Franklin slowly reached his right hand into his jacket pocket. *Id.* at 1:51–52. His hand emerged with a small black pistol, held by the top of the slide.[7] *Id.* at 1:52; ECF No. 20-6 at 38 (still image). The gun was not

---

[5] Unbeknownst to the officers, this was Franklin's ex-partner. *See* ECF No. 20-6 at 12.
[6] Franklin did not actually communicate with the passenger during his encounter with the police. The passenger told police that he repeatedly told Franklin, "Do not get yourself in no trouble," but Franklin did not respond. *See* ECF No. 22-8 at 20.
[7] The firearm was a Ruger LCP, a pocket-sized .380 semiautomatic pistol. *See* ECF No. 20-6 at 23–24.

4

in a firing grip. *Id.*; ECF No. 22-15, 13:12–19. The muzzle was oriented away from officers, pointing in the direction of the Burger King behind him. ECF No. 20-6 at 38. Less than a second later, Officer Kerl fired two shots, striking Franklin in the left arm and abdomen. Video at 1:51–53. Franklin looked shocked and incredulous. *See id.* at 1:54–59. "You told me to," he said. *Id.* at 1:55–58. Franklin slumped against the passenger door and slid to the ground. *Id.* at 1:57–2:07. An ambulance took Franklin to the hospital, where he was pronounced dead less than an hour later. ECF No. 25-6 at 13. All told, 43 seconds elapsed between Officer Kerl getting out of her car and the fatal shooting. Video at 1:09–52. In that time, the officers had shouted commands 26 times—variations of "let me see your hands" four times, and variations of "drop the weapon" 22 times. *Id.*

### B. THE AFTERMATH

Following the shooting, CMPD conducted a homicide investigation into Franklin's death. *See* ECF No. 20-4 at 6. The Mecklenburg County District Attorney's Office reviewed the investigation findings and declined to prosecute Officer Kerl. ECF No. 20-6 at 22.

CMPD also conducted an internal Shooting Review Board (SRB). *See* ECF No. 25-2, 25-4. Senior CMPD officials questioned both Officer Deal and Officer Kerl. *Id.* During the hearing, Officer Deal stated that he could not recall previously telling a suspect to drop a weapon if he could not see one. ECF No. 25-4 at 25. Normally, Officer Deal testified, he would say, "Let me see your hands." *Id.* One board member, Captain Jim Wright, responded: "[I]n this case, [you] cannot see the weapon but there were commands given to drop the weapon . . . . I believe a reasonable person would, if they began to comply, reach for the weapon and then drop the weapon . . . . Would you think that's reasonable?" *Id.* at 25–26. Deal agreed. *Id.* at 26. Another board member, Sergeant William Ratchford, asked similar questions of Officer Kerl:

> RATCHFORD: If I'm a suspect with a weapon . . . and if I have it in my pants, down in my pants, and I get the command from the officer, "put the weapon down,"

5

> or "drop your weapon," I have to take some physical action to do that. The physical action . . . if I am going to obey the command of the officer, is to get the gun as the officer has commanded me to do to put it down. What was your expectation, when [you] asked the suspect to put the gun down?
>
> KERL: To give me some type of—he shouldn't be reaching for anything when an officer is there—you should give them some type of either non-verbal . . . or verbal . . . "hey okay, I got it in my jacket," um, "I'm going to put my hands up," "I'm going to go in and get the gun." Something to tell me what you're doing. I had no idea what that man was doing, at that time.
>
> RATCHFORD: Okay. So, you say you shouldn't reach for anything.
>
> KERL: No.
>
> RATCHFORD: But . . . if you're telling me to reach for it, I'm doing exactly what you're asking me to do. And now you said that I shouldn't be reaching for it. Which is it?
>
> KERL: (Long sigh and pause). Shouldn't be reaching for it. You need to show me some kind of communication . . . . I don't have but a split second to make a decision on what you're doing. I understand, you're saying I said . . . . Drop the weapon. But I thought the weapon was originally in between his hands.[8]

ECF No. 25-2 at 14.

The SRB discussed a number of training issues in Officer Kerl's performance. *See generally* ECF No. 25-2. Ultimately, CMPD reprimanded Kerl for failing to wear a ballistic vest. ECF No. 25-2 at 21. She was also assigned additional training on shooting scenarios and the use of barricades. ECF No. 25-3, 73:14–25, 74:1–14. Nevertheless, the SRB found no training or policy violations and deemed the shooting justified. ECF No. 25-10.

CMPD notified Franklin's mother, Deborah, of its conclusions by certified letter. ECF No. 25-7. Deborah Franklin appealed to the Citizens Review Board (CRB), a community advisory panel established by city ordinance. *See* Charlotte Code of Ordinances §§ 16-56–16-59. The CRB

---

[8] The identifications and punctuation in this portion of the transcript have been cleaned up for clarity and readability.

recommended reversal of the department's decision after convening an evidentiary hearing. ECF No. 24-7. But the police chief, Kerr Putney, refused. ECF No. 24-8. Franklin's mother then appealed to the City Manager, Marcus Jones. By city ordinance, the City Manager "shall review the decision of the chief of police" and "take such action as he deems appropriate." Charlotte Code of Ordinances § 16-62(b). The City Manager refused to overturn the Chief's decision. ECF No. 24-9 at 2.

Franklin's mother commenced suit in this Court in June 2020, suing the City of Charlotte and Officer Kerl in her individual and official capacities. After the close of discovery, all three parties filed dispositive motions. Franklin's mother sought partial summary judgment as to the defendants' liability, seeking a trial on damages only. The City of Charlotte and Officer Kerl moved for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only if the record shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether each of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (cleaned up). In considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion. *Id.*

## III. DISCUSSION

Franklin's mother raises two types of claims. First, invoking 42 U.S.C. § 1983, she argues that Officer Kerl and the City of Charlotte violated Franklin's Fourth Amendment right to be free from excessive force. Second, Franklin's mother argues that the defendants are liable under state

7

tort law for wrongful death, assault and battery, and negligent training. The Court addresses her federal and state claims in turn.

### A. CONSTITUTIONAL CLAIMS UNDER SECTION 1983

Title 42, United States Code, Section 1983 creates a "species of tort liability for the deprivation of any rights, privileges, or immunities secured by the Constitution." *Manuel v. City of Joliet*, 137 S. Ct. 911, 916 (2017). Franklin's mother raises two types of § 1983 claims. First, she argues that Officer Kerl violated her son's Fourth Amendment right to be free from excessive force. Second, she argues that the City of Charlotte ratified Officer Kerl's actions by concluding that the shooting was justified.

#### i. Individual Claim

Franklin's mother argues that her son's fatal shooting violated his Fourth Amendment right to be free from unreasonable seizures effectuated by excessive force. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Graham v. Connor*, 490 U.S. 386, 394 (1989). In response, Officer Kerl argues that she did not violate Franklin's Fourth Amendment rights because she reasonably believed that he presented an imminent deadly threat. Kerl also argues that even if her use of force was unconstitutional, she is still entitled to summary judgment because of the doctrine of qualified immunity. The Court will address the qualified immunity argument first.

##### 1. Qualified Immunity

Qualified immunity is a legal doctrine that shields public officials from suits for money damages. *See United States ex rel. Citynet, LLC v. Gianato*, 962 F.3d 154, 159 (4th Cir. 2020). The doctrine "balances . . . the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In other words,

8

Case 3:20-cv-00330-GCM   Document 43   Filed 11/19/21   Page 8 of 19

it is intended to ensure that "executive officials remain both accountable to the law and energetic in their duties—wielding the sword with neither tyranny nor trepidation." *Dean v. McKinney*, 976 F.3d 407, 422 (4th Cir. 2020) (Richardson, J., dissenting).

The protections of qualified immunity may extend to police officers accused of excessive force. *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991). Police officers are entitled to immunity when they commit constitutional violations but reasonably believe that their actions were lawful in the light of clearly established law. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). There are two prongs to analyze when considering a claim of qualified immunity. First, the court considers whether a constitutional violation occurred. *Id.* at 232. Second, the court considers whether the right violated was clearly established at the time of the violation. *Id*. There is no set order of operations: the court can consider these prongs in any order. *Id.* at 236.

The Court first confronts the "clearly established" prong. On the one hand, it is true that there is a longstanding constitutional right to be free from unreasonable seizures, including the right to be free of seizures effected by excessive force. *See Graham*, 490 U.S. at 388; *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006). On the other hand, the Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality."[9] *City of Tahlequah v. Bond*, 595 U.S. __, 2021 U.S. LEXIS 5310, at *4 (Oct. 18, 2021) (per curiam). In two recent per curiam decisions, the Supreme Court reversed denials of qualified immunity because the case law demonstrating "clearly established" law presented insufficiently similar factual circumstances. *See id.*; *Rivas-Villegas v. Cortesluna*, 595 U.S. __, 2021 U.S. LEXIS 5311,

---

[9] The Court emphasized that the need for specificity is "especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *City of Tahlequah v. Bond,* 595 U.S. __, 2021 U.S. LEXIS 5310, at *4–5 (Oct. 18, 2021) (per curiam).

9

at *5–7 (Oct. 18, 2021). For purposes of the present analysis, the Court will assume without deciding that the right at issue was clearly established.

Turning to the constitutional violation prong, the parties disagree vehemently about whether Officer Kerl's use of force was excessive or unreasonable. Under the Fourth Amendment, an officer's use of force does not violate the Constitution if it is objectively reasonable in light of the facts and circumstances, without regard to the officer's underlying intent or motivation. *See Graham*, 490 U.S. at 388. The reasonableness of force is assessed at the time the force is used, not "with the 20/20 vision of hindsight." *See id*. at 396. This is because the "calculus of reasonable force must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Many of the cases which apply qualified immunity and excessive force involve mistakes by police officers. In *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001), police officers received a report that a man might be armed at a mall. *Id*. at 128. The officers stopped the man and ordered him to raise his hands. *Id*. The man initially complied, but then reached into his back pocket to turn off his Walkman radio. *Id.* A police officer shot him three times. *Id.* As it turned out, the man was unarmed. The Fourth Circuit affirmed the trial court's decision to apply qualified immunity. *Id*. at 132–33.

Another relevant case is *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991). In that case, police officers in a traffic stop ordered a man in a vehicle to put his hands up. *Id.* at 215. Instead, the man turned away with his hands partially closed around an object. *Id.* Police opened fire. *Id.* The object turned out to be a beer bottle. *Id.* In that case, the Fourth Circuit concluded that the officer was entitled to qualified immunity. *Id*. at 217.

10

The upshot from cases like *Anderson* and *Slattery* is that qualified immunity is available when police officers make reasonable mistakes in the conduct of their official duties. *See Gooden v. Howard County*, 954 F.2d 960, 965–66 (4th Cir. 1992). This is true even when police officers shoot and kill individuals who retrospectively posed no threat to the officers or anyone else. *See Anderson*, 247 F.3d at 132; *Slattery*, 939 F.2d at 216; *Milstead v. Kibler*, 243 F.3d 157, 165 (4th Cir. 2001) (police accidentally shot a victim instead of his assailant); *Lee v. Beavington*, 647 F. App'x 275, 283 (4th Cir. 2016) (SWAT team shot a barricaded suspect holding what turned out to be a shoe).

By contrast, the Fourth Circuit has denied qualified immunity where officers made *unreasonable* mistakes in the performance of their duties. *See, e.g.*, *Purnell*, 652 F.3d at 527 (denying qualified immunity to a police officer who mistakenly shot a suspect with a pistol instead of a Taser); *Cooper v. Sheehan*, 735 F.3d 153, 154 (4th Cir. 2013) (denying qualified immunity to police who, without warning, shot an armed homeowner who came out to investigate rapping on his window). Franklin's mother argues that this is one such case, relying principally on *Hensley v. Price*, 876 F.3d 573 (4th Cir. 2017) and the lower court decision in that case, *Hensley v. Suttles*, 167 F. Supp. 3d 753 (W.D.N.C. 2016).

*Hensley* involved a shooting by two sheriff's deputies in Haywood County, North Carolina. 876 F.3d at 577. The deputies responded to a domestic disturbance call at Hensley's house early one morning. *Id.* at 578. Hensley came outside with a pistol. *Id.* His children, following in trail, attempted to take the gun. *See id.* Hensley broke away, striking one of his daughters with his handgun. *Id.* He then walked towards the deputies with the muzzle of his handgun pointed down. *Id.* Without issuing any commands—indeed, without ever speaking—the deputies shot and killed

11

Hensley. *Id.* The District Court denied summary judgment for the deputies, refusing to apply qualified immunity. The Fourth Circuit affirmed. *Id.* at 577.

Franklin's mother argues that *Hensley* controls this case because, as in *Hensley*, the firearm held by her son did not pose an immediate threat to anyone. But the facts in *Hensley* were significantly different than in this case. As the Fourth Circuit emphasized, it was unreasonable for police to perceive a threat from Hensley because (1) Hensley was armed at his home; (2) he never pointed the weapon or did anything threatening; and (3) he had not received any warnings from the police before they opened fire. *See id*. at 583–85. By contrast, (1) Franklin was armed in public; (2) the police had reports that Franklin was attempting to fight someone; and (3) the police issued 26 commands before Officer Kerl opened fire.

Given the gift of hindsight, it seems likely that Officer Kerl made a mistake in shooting Danquirs Franklin. Franklin appeared to be complying with the CMPD officers' orders to "drop the gun" when he took the pistol out of his jacket pocket. Video shows that he was holding the slide of the pistol, not the grip. And Franklin's incredulous last words—"You told me to"—seem to confirm his intentions nearly beyond doubt. But because a court must not judge with the "20/20 vision of hindsight," *Graham*, 490 U.S. at 396, the question is whether Officer Kerl's mistake in shooting Franklin was reasonable. The answer is yes.

Minutes before the shooting, Officer Kerl was dispatched to a "Priority One" 911 call involving an armed suspect at the Burger King who was attempting to assault someone. She learned en route to the call that an individual matching the suspect's description was outside in the parking lot. When Officers Kerl and Deal arrived, they found Franklin crouched next to a vehicle with his hands hidden between his legs. Based on the information that the officers had from

12

dispatch and the RTCC, it was reasonable to believe that a gun was in his hands.[10] It was also reasonable to believe, based on Franklin's lack of eye contact, detached demeanor, and general nonresponsiveness, that Franklin was not complying with police orders. Taken together, those facts made it reasonable for Officer Kerl to open fire when Franklin's hand came out of his jacket holding a gun.[11]

Franklin's mother argues that there was no immediate threat, because Officer Kerl fired when "the gun held in that position was not a threat to anyone." ECF No. 22 at 20. But it was reasonable for Officer Kerl to perceive a threat: Although Franklin did not draw the gun suddenly, he gave no indication that he was complying with police commands until after he was shot. The pistol in question was small and dark, making its detailed features hard to make out in a compressed timeframe. And things happened quickly: less than a second passed between Franklin's hand coming out of his pocket, and a gun being in his hand. *See* Video at 1:51; ECF No. 29-1 at 20. Indeed, things happened so quickly that each of the three witnesses with a view of the gun—Officer Deal, Officer Kerl, and the Honda passenger—had a different recollection of which way the gun was oriented, and all three witnesses were wrong. *See* ECF No. 20-6 at 20–21. Quite aside from the fact that an officer need not "wait until a gun is pointed at the officer before the officer is

---

[10] Franklin's mother argues that Officer Kerl's testimony about what Kerl knew or perceived during the shooting has varied, and argues that the Court cannot grant summary judgment for that reason. *See* ECF No. 29 at 12–14. However, the Court does not rely on the testimony identified by Franklin's mother. Instead, it views the material facts as they are depicted in the body camera footage, and views any remaining facts (when reviewing defendants' motions) in the light most favorable to the plaintiff. *See Hupp v. Cook*, 931 F.3d 307, 315 n.3 (4th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372 (2007)).

[11] Defendants also invite the Court to consider, as part of the reasonableness inquiry, facts that were unknown to the police at the time of the shooting. For example, they ask the Court to consider that the Honda's passenger subsequently reported being frightened during the encounter, and that police later learned that Franklin had assaulted his ex-partner inside the Burger King before coming outside. *See* ECF No. 19-1 at 9; ECF No. 20-3. The Court agrees with Franklin's mother that those facts are not relevant, and it does not consider them.

13

entitled to take action," this situation presents exactly the type of "split-second judgment" in a "tense, uncertain, and rapidly evolving" situation that qualified immunity is intended to account for. *Anderson*, 247 F.3d at 131; *Graham*, 490 U.S. at 396–97.

Franklin's mother argues that Officer Kerl "completely mishandled this encounter" with her son, pointing to shortcomings in her tactics. ECF No. 22 at 17. She points out that Officer Deal could not recall previously commanding a suspect to drop a weapon without seeing one. She notes that Officer Kerl left cover, contrary to her training, and crossed the path of Officer Deal's weapon. But the question is not whether Officer Kerl utilized optimal tactics or followed every part of her training. Rather, the question is whether Officer Kerl's actions—as understood by a reasonable officer in the same situation—were reasonable.[12] The answer is yes. Accordingly, Officer Kerl is entitled to the protection of qualified immunity.

### 2. Excessive Force Claim

Because the Court concludes in the qualified immunity analysis that Officer Kerl's use of force was reasonable, and not excessive under the Fourth Amendment, the Court concludes—substantially for the reasons discussed above—that Officer Kerl did not violate the Fourth Amendment.

Under the *Graham* framework, a court considering an excessive force claim should consider the particular "facts and circumstances of each particular case," including (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers

---

[12] This is also why the Court does not find the plaintiff's expert report persuasive: it primarily discusses police "best practices" and tactics, focusing on factors that are not part of the relevant legal inquiry. *See* ECF No. 29-1 at 23–41 (focusing on officer tactics preceding the shooting); ECF No. 29-3 at 5 (explaining source of expert's opinion); *Gandy v. Robey*, 520 F. App'x 134, 142 (4th Cir. 2013) ("A police officer's pre-seizure conduct, regardless of whether it was ill-advised or violative of law enforcement protocol, is generally not relevant for purposes of an excessive force claim under the Fourth Amendment . . . .").

14

or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

The first and third of these factors are inconclusive. Starting with the severity of the crime at issue, an objective officer in Officer Kerl's position would know that Franklin was suspected of committing one or more crimes involving a firearm. The severity of those crimes, however, is unclear. At the time of the shooting, Officer Kerl and Officer Deal knew that an armed individual matching Franklin's description had attempted to fight someone in the Burger King but did not know whether Franklin had succeeded in doing so.[13] The third *Graham* factor does not apply, because Franklin was neither actively resisting nor attempting to flee.

Instead, as discussed above, the use of force in this case hinged on the second factor: an immediate threat to the safety of officers and others. After reasonably (but mistakenly) perceiving a deadly threat, Officer Kerl fired two shots, killing Franklin. Viewed in the light most favorable to Franklin's mother, Kerl's use of force did not amount to a constitutional violation. *See Anderson*, 247 F.3d at 132.

### ii. Municipal Claims

Municipalities, like individuals, can be liable for violating constitutional rights under 42 U.S.C. § 1983. *See Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658, 690 (1978). Municipalities do not enjoy the protections of qualified immunity. *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 402 (4th Cir. 2014). However, municipalities are not liable simply because they employ someone who violated a plaintiff's rights. *Monell*, 436 U.S. at 691. Instead, municipalities can be

---

[13] The City of Charlotte argues that Franklin's crimes included "kidnapping, false imprisonment, assault with a deadly weapon, assault on a female, communication of threats, and trespassing." ECF No. 18-1 at 20. But because many of the facts underlying those crimes were not known to the responding officers, those crimes could not be relevant in assessing the reasonableness of force under *Graham*.

15

liable only when their deliberate conduct was the moving force behind the injury alleged. *See id*. at 694. Put another way, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997).

There are four ways for a plaintiff to hold a city liable under § 1983: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). Franklin's mother takes the second route, arguing that the City Manager's decision not to overturn the shooting investigation constituted "ratification" of unconstitutional action. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) ("If the authorized policy-makers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final . . . ."); ECF No. 22 at 18.

This argument must fail for two reasons. First, as discussed earlier, the shooting by Officer Kerl did not violate Franklin's Fourth Amendment rights. As a result, the city's ratification of Officer Kerl's shooting could not inflict any constitutional injury. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999).

The second reason that the City of Charlotte cannot be liable relates to timing and causation. As discussed earlier, a plaintiff seeking to prove municipal liability must show that the city's conduct was a "moving force" of the constitutional injury, providing a "direct causal link between the municipal action and the deprivation of federal rights." *See Monell*, 436 U.S. at 694;

16

*Brown*, 520 U.S. at 404. No such showing can be made here. Even if Officer Kerl's shooting had been unconstitutional, the City Manager's post-facto approval of an internal shooting investigation cannot possibly have caused the constitutional violation.[14] *See Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009); *Salvato v. Miley*, 790 F.3d 1286, 1296–97 (11th Cir. 2015); *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1189–90 (D. Haw. 2003); *Skeen v. Wash. Cty. Sheriff's Office*, Case No. 1:20CV00017, 2020 U.S. Dist. LEXIS 210944, at *17–18 (W.D. Va. Nov. 12, 2020).

Because the City Manager's refusal to overturn the police investigation of Franklin's shooting could not cause any constitutional injury, the City of Charlotte did not violate Franklin's constitutional rights.

## B. STATE TORT CLAIMS

Franklin's mother also raises three types of state tort claims: (1) wrongful death; (2) assault and battery; and (3) negligent training. *See generally* N.C. Gen. Stat. § 28A-18-2 (wrongful death); *Wilkerson v. Duke Univ.*, 748 S.E.2d 154 (N.C. Ct. App. 2013) (listing elements of assault and battery torts). Because the first two types of claims are foreclosed by the same reasoning, the court will discuss those claims together before turning to the negligent training claim.

### i. Wrongful Death, Assault, and Battery

North Carolina law authorizes police officers to use deadly force when "reasonably necessary" to defend themselves or third parties from "what [they] reasonably believe[] to be the use or imminent use of deadly physical force . . . ." N.C. Gen. Stat. § 15A-401(d)(2). As the parties recognize, the state law on reasonable force mirrors the Fourth Amendment standard. *See London*

---

[14] This analysis applies equally to the official-capacity claims made against Officer Kerl. See *Wyche v. City of Franklinton*, 837 F. Supp. 137, 144 (E.D.N.C. 1993) ("A suit against a city official in his official capacity is a suit against the city itself.").

*v. Hamilton*, Civil Action No. 3:95CV347-MCK, 1996 U.S. Dist. LEXIS 22485, at *26 (W.D.N.C. Nov. 26, 1996).

Because Officer Kerl's use of deadly force was reasonable under *Graham*, it also complied with state law. *See Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788–89 (4th Cir. 1998) (rejecting a state wrongful death claim because police officer's actions were reasonable); *see also Turner v. City of Greenville*, 677 S.E.2d 480, 483–84 (N.C. Ct. App. 2009) (rejecting state law claims for negligence and assault and battery because officers' conduct was appropriate under the deadly force statute). Consequently, Defendants are entitled to judgment as a matter of law on the wrongful death, assault, and battery claims.[15]

### ii. Negligent Training

Finally, Franklin's mother argues that the City of Charlotte is liable for negligent training. She claims that the City was "manifestly negligent" in training Officer Kerl based on the City Manager's ratification of Kerl's shooting. ECF No. 22 at 24–25.

To establish a claim for negligent supervision or training in North Carolina, a plaintiff must prove:

> The specific negligent act on which the claim is founded; (2) incompetence, by inherent unfitness or previous specific acts of negligence from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision; and (4) that the injury complained of resulted from the incompetency proved.

---

[15] Having concluded that Officer Kerl's use of force was reasonable, the Court has no occasion to decide whether North Carolina's doctrine of public official immunity applies, or to address the parties' arguments about contributory negligence and the last clear chance doctrine.

*Sauers v. Winston-Salem/Forsyth County Board of Education*, 179 F. Supp. 3d 544, 556 (M.D.N.C. 2016); *see Medlin v. Bass*, 398 S.E.2d 460, 462 (N.C. 1990).[16] As a matter of law, these elements have not been established. Specifically, there is no evidence of "inherent unfitness or previous specific acts of negligence," nor is there evidence that the City of Charlotte had any actual or constructive notice of unfitness or incompetence by Officer Kerl. For this reason, summary judgment is appropriate on the negligent training claim.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Partial Summary Judgment (ECF No. 21) is **DENIED**. Defendant Wende Kerl's Motion for Summary Judgment (ECF No. 19) is **GRANTED**. Defendant City of Charlotte Motion for Summary Judgment (ECF No. 18) is **GRANTED.** Because there are no remaining claims,[17] this case is **DISMISSED** with prejudice.

**SO ORDERED.**

Signed: November 19, 2021

Graham C. Mullen
United States District Judge

---

[16] Franklin's mother argues that this is the incorrect standard for negligent training, but cites no case law supporting another standard. *See* ECF No. 30 at 14.

[17] As no causes of action survive the Court's ruling, the Court will also dismiss the standalone claim for punitive damages. *See Iadanza v. Harper*, 611 S.E.2d 217, 223 (N.C. Ct. App. 2005) ("[P]unitive damages do not and cannot exist as an independent cause of action, but are mere incidents of the cause of action . . . .") (cleaned up).